BENNETT J. LEE (Bar No. 230482)
ANDREW VAN ORNUM (Bar No. 214040)
WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
333 Bush Street, Suite 1500
San Francisco, California  94104
Telephone:	415-623-7000
Facsimile:	415-623-7001
E-Mails:	blee@wthf.com;
	avanornu@wthf.com

Attorneys for Plaintiff
HARRIS CONSTRUCTION CO., INC.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| HARRIS CONSTRUCTION CO., INC., a California corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>TULARE LOCAL HEALTHCARE DISTRICT, a California public entity; dba TULARE REGIONAL MEDICAL CENTER; SHAWN BOLOUKI, in his individual capacity and, alternatively, in his official capacity as Chief Executive Officer of  Tulare Regional Medical Center, inclusive,<br><br>            Defendants. | Case No. _____<br><br>**PLAINTIFF HARRIS CONSTRUCTION CO., INC.'S COMPLAINT FOR:**<br><br>1.   **Declaratory Relief;**<br>2.   **Injunctive Relief; and**<br>3.   **Violations of 42 U.S.C. § 1983.**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, HARRIS CONSTRUCTION CO., INC. ("HARRIS"), by counsel, and for its Complaint against Defendants TULARE LOCAL HEALTHCARE DISTRICT, TULARE REGIONAL MEDICAL CENTER, SHAWN BOLOUKI, and DOES 1-50, states as follows:

///

///

///

## PARTIES

1. Plaintiff HARRIS is incorporated in the State of California and has its principal place of business in Fresno, California. HARRIS has been in the construction industry for nearly 100 years, is authorized to transact business in the State of California, and has continuously maintained licensure as a general contractor in all classifications necessary to perform the work described in this Complaint.

2. Upon information and belief, Defendant TULARE LOCAL HEALTH CARE DISTRICT is a California public entity, formed and operating under the laws of the State of California, with full power to solicit bids, enter into contracts, to erect, construct, alter, and repair public works within the State of California.

3. Upon information and belief, Defendant TULARE LOCAL HEALTH CARE DISTRICT is, and at all relevant times was, doing business as TULARE REGIONAL MEDICAL CENTER ("TRMC").

4. Upon information and belief, Defendant SHAWN BOLOUKI is, and at all relevant times was, the Chief Executive Officer and a public employee and authorized agent of the TULARE LOCAL HEALTHCARE DISTRICT dba TULARE REGIONAL MEDICAL CENTER, and at all relevant times was acting within the course and scope of his employment and under color of authority and the laws of the State of California.

5. Upon information and belief, as the Chief Executive Officer of Defendant TULARE LOCAL HEALTHCARE DISTRICT dba TULARE REGIONAL MEDICAL CENTER, Defendant SHAWN BOLOUKI has final policymaking authority for the TULARE LOCAL HEALTHCARE DISTRICT dba TULARE REGIONAL MEDICAL CENTER.

6. TULARE LOCAL HEALTH CARE DISTRICT dba TULARE REGIONAL MEDICAL CENTER and SHAWN BOLOUKI shall be known collectively as "Defendants."

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims arising under federal law against Defendants pursuant to 42 U.S.C. §§ 1983 and 1988. This Court also has supplemental jurisdiction over Plaintiff's other claims

pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over all Defendants because the Defendants reside or are located within the Eastern District of California.

9. Venue is proper in the United States District Court for the Eastern District of California, Fresno Division. Defendants TULARE LOCAL HEALTH CARE DISTRICT, TULARE LOCAL HEALTH CARE DISTRICT, and SHAWN BOLOUKI are residents of Tulare, County of Tulare, California. Further, all of the Defendants are residents of California, and a substantial portion of the contract negotiations between the parties and Plaintiff's damages occurred in Fresno, County of Fresno, California. Venue is thus proper in this Court under 28 U.S.C. § 1391, subdivisions (b)(1) and (b)(2).

## INTRADISTRICT ASSIGNMENT

10. Pursuant to Eastern District Local Rule 120, this action is properly commenced in and assigned to the Fresno Division of the Eastern District because a substantial part of the events giving rise to the claims in this action occurred within the City and County of Fresno.

## FACTUAL BACKGROUND

11. Defendants sought to expand the Tulare Regional Medical Center by designing and constructing a structure known as "Tower 1."

12. The present matter arises from a public works project to furnish labor and materials necessary to construct the Tulare Regional Medical Center Tower 1 Expansion Project (the "Project"), located at 869 N. Cherry Street, Tulare, California 93274.

13. The original scope of work on the Project included the construction of a 115,000 square foot, four story Medical Tower and basement that is designed to be tied-in to the existing Tulare Regional Medical Center buildings.

### TRMC Cuts Corners on its Design And Ignores The Standard Of Care And Its Design Obligations Under California Law

14. Upon information and belief, Defendants contracted with design professionals, consultants, engineers, and other individuals (collectively the Defendants' "Design Team") to, among other things, provide the Contract Documents that would be used for bidding and

construction of the Project, including detailed construction plans and specifications.

15. Upon information and belief, the Design Team's professional and contractual responsibilities included providing a Project design and Contract Documents that complied with all applicable government regulations as well as industry practices and standards, and was full, complete, coordinated, accurate, and sufficient for its intended purpose.

16. Upon information and belief, Defendants also bore responsibility for review and approval of any changes or modifications to its design and Contract Documents, as well as obtaining approval of certain design documents by the California Office of Statewide Health Planning Department ("OSHPD").

17. The California Public Contract Code requires that all plans and specifications issued in connection with a public works project be full, complete, and accurate, giving such directions as will enable any competent builder to carry them out.

18. California Government Code section 4526 requires that, notwithstanding any other provision of law, selection by a state or local agency head for professional services of private sector architectural, landscape architectural, engineering, environmental, land surveying, or construction project management firms shall be on the basis of demonstrated competence and on the professional qualifications necessary for the satisfactory performance of the services required.

19. Upon information and belief, the design documents and specifications created by Defendants' Design Team were defective in several crucial respects, including but not limited to:

    a. Failure to design a safe means for doctors, hospital employees, patients, and members of the public to enter and exit the existing Medical Center during construction;

    b. Failure to account for the actual existing Medical Center buildings, requiring demolition of an existing building that stood in the path of the design for the Project; and

    c. Design called for mechanical, electrical, and plumbing utilities in corridors, but corridors designed could not physically fit all services.

20. Upon information and belief, the plans and specifications created and provided by

1  the Design Team were not full, complete, and accurate, and failed to give such directions as could enable any competent builder to carry them out, and were therefore not in compliance with applicable California law, a fact that Defendants never disclosed to HARRIS.

21. Upon information and belief, Defendants failed to select competent architectural, engineering, and/or project management firms capable of satisfactorily performing the required services in connection with the Project.

### Harris Bids On The Project And Is Selected As The General Contractor

22. HARRIS submitted extensive documentation to Defendants in order to secure pre-qualification prior to bidding on the Project, and HARRIS was pre-qualified by Defendants as having all required experience and qualifications necessary to perform the work on the Project.

23. When estimating and planning its work on the Project during the bid phase, HARRIS reasonably and justifiably relied upon Defendants' warranty that HARRIS would be working from a complete and constructible set of plans and specifications for the Project.

24. When estimating and planning its work on the Project during the bid phase, HARRIS was directed to and did select its subcontractors from a pool of pre-qualified subcontractors established by Defendants.

25. In 2010, HARRIS submitted a formal bid to serve as the general contractor on the Project in an amount of approximately $34,451,000.

26. Defendants awarded the contract (hereinafter "Contract") to HARRIS. The original contract price was $34,451,000 with an original duration of 883 days.

27. In connection with Defendants' award of the Contract to HARRIS, HARRIS was required to and did obtain a performance bond from the Travelers Casualty and Surety Company in the penal sum amount of $34,451,000 (hereinafter "Performance Bond").

28. The Performance Bond includes indemnity provisions that place an indemnification obligation upon HARRIS and its principals. As such, any demand on the Performance Bond, whether proper or not, puts HARRIS and its principals, as indemnitors, at great financial risk.

29. TRMC has since admitted that it lacked sufficient funding to complete all design

and construction activities required to complete the Project at the time of Contract award. Upon information and belief, TRMC concealed this fact from both HARRIS and its Performance Bond surety.

### TRMC Proceeds With Construction Of The Project Based On A Defective Design

30. Upon information and belief, against the recommendations of the original Design Team and contrary to California law, Defendants made the decision to move forward with construction by issuing a "Notice to Proceed" to HARRIS with incomplete, defective, and unconstructible Contract Documents.

31. Defendants issued the Notice to Proceed with construction to HARRIS in approximately May 2010.

32. Based on Defendants' defective design and Contract Documents, HARRIS was unable to begin meaningful work on the Project until several months after the issuance of the Notice to Proceed.

### TRMC Makes Significant Design Changes Mid-Project Resulting In Considerable Delays And Cost Overruns

33. During the course of the Project, Defendants have made changes to the design of the Project, resulting in significant and unnecessary delays and cost increases, including but not limited to:

    a. Defendants' decision to re-design the Project to incorporate construction of a data center;

    b. Defendants' decision to re-design the Project to incorporate construction of a new "central sterile" facility;

    c. Defendants' decision to re-design the Project to turn fourth floor exterior patio areas into luxury "suites."

    d. Defendants' decision to re-design the Project to incorporate construction of an additional "hybrid operating room" on the second floor;

    e. Defendants' decision to re-design the Project to incorporate construction of a new "doctors' lounge" on the second floor;

  f. Defendants' decision to re-design the Project to reconfigure the generator yard; and

  g. Defendants' decision to add a "helipad" onto the roof of the new Medical Tower.

34. Each of the above-mentioned modifications by Defendants' Design Team, and others, resulted in extensive delays to construction in order to obtain necessary OSHPD approval, and ultimately caused the Contract Documents to become even less constructible.

35. As a result of each of the above-mentioned modifications by Defendants' Design Team, and others, HARRIS was required to repeatedly re-coordinate its work on the Project, significantly impacting the time and expense of the Project.

### TRMC Experiences Major Funding Issues And Currently Lacks Sufficient Funding To Complete The Project

36. Upon information and belief, TRMC obtained funding for the Project from an $85 million voter-approved General Obligation Bond (the "Bond Funds"), which were to be used exclusively for construction costs associated with the Project.

37. As of August 2013, public records show that TRMC had expended approximately $79,965,000 of the Bond Funds in connection with Project, and that TRMC had approximately $13,474,000 in remaining Bond Funds available for completion of the Project.

38. Upon information and belief, as of August 2013, there remains at least $19,000,000 in additional work remaining under HARRIS' Contract with TRMC to complete the Project, with construction currently estimated to be complete in June 2015.

39. Upon information and belief, HARRIS is entitled to at least approximately $2,700,000 in additional compensation for additional Project-related work that is currently pending TRMC approval, a figure that continues to increase weekly.

40. Upon information and belief, due to significant TRMC-caused Project delays, TRMC is obligated by contract to compensate HARRIS and its subcontractors in an additional amount of several million dollars for extended and additional overhead and other compensable costs.

41. Upon information and belief, TRMC's available funding to complete the Project is several million dollars short of the approximately $25,000,000 to $30,000,000 that will be necessary to complete the Project and meet TRMC's existing Project-related obligations.

42. According to public records, as far back as 2010, TRMC's Chief Financial Officer notified Defendant SHAWN BOLOUKI of a funding shortfall of at least $10,000,000 needed to complete the Project.

43. TRMC has repeatedly represented, falsely or erroneously, that any funding shortfalls would be supplemented by income from ongoing TRMC operations. According to public records, however, in July 2013 TRMC experienced a net operating loss for the month of over $450,000, and in August 2013 experienced a subsequent net operating loss for the month of over $1,510,000. Year to date, TRMC has experienced losses exceeding $1,900,000, or 679% over its projected losses in its budget.

44. TRMC has repeatedly represented, falsely or erroneously, that any Project funding shortfalls would be supplemented by TRMC's "cash reserves." According to public records, however, in July 2013 TRMC had less than $9,000,000 in cash and cash equivalents available, and by August 31, 2013 that amount had been depleted by more than $1,000,000 to less than $8,000,000.

45. Despite these funding deficiencies, TRMC has directed HARRIS to perform at least $20,000,000 in work above and beyond the original Contract price, with additional changes in work being directed weekly by TRMC.

46. Upon information and belief, Defendants terminated TRMC's auditor in an effort to conceal financial mismanagement and other improprieties, including but not limited to misallocating Bond Funds and/or misappropriating Bond Funds to cover TRMC's ongoing operations losses.

47. Upon information and belief, Defendants terminated a law firm hired to conduct an internal investigation of TRMC's operations in an effort to conceal financial mismanagement and other improprieties.

48. Upon information and belief, Defendants' current financial obligations to HARRIS

and its subcontractors greatly exceed all sources of funding available to Defendants.

### TRMC's Attempts To Compel Harris To Perform Extra-Contractual Work Without Any Intent Or Ability To Compensate Harris

49. Upon information and belief, in an effort to avoid expending dwindling Project funds, TRMC has adopted a practice of ordering HARRIS to perform changed/additional work that TRMC has no intent or ability to pay for by issuing "Unilateral Change Orders" to HARRIS with "not to exceed" amounts that represent only a fraction of the actual cost of the changed work.

50. Upon information and belief, Defendants know or reasonably should know that the "not to exceed" amounts set forth in Defendants' Unilateral Change Orders do not represent a fair, accurate, or legitimate amount for the work to be performed by HARRIS.

51. TRMC's orders to HARRIS to perform such work include, but are not limited to, issuance of Unilateral Change Order Nos. 511 and 512, directing HARRIS to perform several hundred thousand dollars' worth of additional plumbing work for only a fraction of the actual cost.

52. Under the terms of the Contract, Defendants are under an affirmative obligation to compensate HARRIS for work performed under Unilateral Change Orders on a "time and materials" basis upon HARRIS' submission of substantiating documents reflecting the time and materials costs for such work.

53. Upon information and belief, Defendants have expressed an intent not to compensate HARRIS for any time and materials work performed that exceeds the arbitrary and illegitimate amount set forth in the Unilateral Change Orders, regardless of HARRIS' entitlement to compensation for such work actually performed.

54. Upon information and belief, should HARRIS continue to perform such work at Defendants' direction under Unilateral Change Orders, TRMC will refuse to and be unable to pay HARRIS the adequate compensation it is entitled to under the Contract due to TRMC's lack of funding to complete the Project. In effect, HARRIS will be forced to continue funding the Project on Defendants' behalf, while Defendants will have essentially taken HARRIS' property

without compensation.

## TRMC Threatens To Issue A Termination For Default In An Improper And Unlawful Attempt To Collect On Harris' Performance Bond

55. On or about September 9, 2013, Defendants issued a "Notice to Work or Quit" to HARRIS, directing HARRIS to perform certain plumbing work on the Project under a Unilateral Change Order "not to exceed" amount totaling approximately $50,000.

56. Upon information and belief, the actual cost of the plumbing work to be performed by HARRIS will exceed $270,000.

57. Upon information and belief, Defendants are aware of the true cost of the work to be performed, and lack any reasonable or good faith basis to believe the plumbing work at issue can be performed at a cost of approximately $50,000.

58. Upon information and belief, through these actions, Defendants have sought to perpetuate a scheme to:

    a. Compel HARRIS to perform substantial work on the Project which Defendants have neither the intent nor ability to pay for; and/or

    b. Manufacture contrived grounds to proceed forward with a baseless and improper issuance of a termination for default against HARRIS in an effort to secure additional funding from HARRIS' Performance Bond.

59. Upon information and belief, Defendants' issuance of Unilateral Change Order Nos. 511 and 512 and the subsequent September 9, 2013 Notice to Work or Quit were taken as substantial steps in furtherance of Defendants' scheme to wrongfully and unlawfully compel HARRIS to fund completion of the Project and/or terminate HARRIS for default, and Defendants intend to immediately proceed forward with such termination.

60. Defendants have also threatened to make a formal demand on the Performance Bond, which demand would be baseless, improper, and cause significant and irreparable harm to HARRIS' business and reputation.

61. Termination for default is considered a severe and drastic measure, results in a forfeiture, and carries deep ramifications for any contractor whose business involves government

contracts and public works projects.

62. Termination for default is the most extreme remedy available to an owner, and is a drastic sanction which should be imposed or sustained only for good grounds and upon solid evidence. Courts have gone so far as to declare a judicial aversion to default termination.

63. Termination for default would result in a constructive or *de facto* debarment of HARRIS from working on future public works project, striking a devastating and irreparable blow to HARRIS business and employees.

64. Defendants lack any factual basis or legitimate grounds under either the Contract or California law to proceed with issuance of a termination for default against HARRIS under the circumstances.

### Harris Faces Imminent And Irreparable Harm At The Hands Of TRMC And Lacks Any Cognizable Or Adequate Remedy At Law

65. Due to TRMC-caused delays for which HARRIS is owed significant compensation, the current anticipated completion date for the Project is June 2015.

66. Upon information and belief, TRMC lacks sufficient funding to continue construction of the Project through completion.

67. Unlike a private works construction project, where legal remedies such as a mechanics' lien or stop notices are available to secure a contractor's right to payment for work performed, a public works construction project such as the Project permits no such remedies to contractors against an owner, and a contractor has no remedy available against an owner to secure its right to payment, particularly as in this case the public owner is insolvent or near insolvency.

68. Upon information and belief, should Defendants continue to compel HARRIS to perform work on the Project without having adequate funding to pay for such work, HARRIS will suffer irreparable injury, because, in part, legal remedies will be wholly insufficient due to the dire financial condition of TLHCD and TRMC and the likelihood of the organization's imminent insolvency.

69. Upon information and belief, due to Defendants' rapidly deteriorating financial condition, Defendants have sought but failed to enter into an "alignment" with another medical

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW

- 11 -

HARRIS CONSTRUCTION CO., INC.'S COMPLAINT

provider that would provide much needed funding.

70. Upon information and belief, should Defendants' efforts to secure an "alignment" with another medical provider continue to prove fruitless, Defendants have no resort but to proceed towards entering into bankruptcy protection under the Federal Bankruptcy Code.

71. Upon information and belief, should Defendants be permitted to move forward with their plan to issue a termination for default against HARRIS, HARRIS will suffer severe and irreparable harm to its reputation. HARRIS lacks any adequate legal remedy to address such harm, as the act of termination for default alone will cause irreparable reputational and business harm that cannot be later remedied.

72. Upon information and belief, legal remedies are insufficient to recompense HARRIS for the harm it has suffered and will continue to suffer as a result of TLHCD's and TRMC's dire financial condition and the likelihood of the organization's imminent insolvency.

73. For these reasons, HARRIS is entitled to immediate equitable remedies, including declaratory and injunctive relief, as set forth more fully below.

## FIRST CAUSE OF ACTION: DECLARATORY RELIEF

### (Against All Defendants)

74. HARRIS incorporates all of the above paragraphs as though each were fully set forth herein.

75. An actual controversy has arisen and presently exists between HARRIS and Defendants as herein described with regard to Defendants' attempts to unlawfully issue a termination for default against HARRIS and/or compel HARRIS to perform work under the Contract that Defendants have neither the intent or ability to pay for, and with respect to the relative rights, duties, and obligations of the parties.

76. HARRIS contends, and Defendants dispute, that Defendants' actions to: (a) issue a termination for default against HARRIS under the above-described circumstances; and/or (b) compel HARRIS to perform further change work under the Contract that Defendants have neither the intent or ability to compensate HARRIS for are unlawful, invalid, and in violation of controlling California and federal law on a variety of grounds, including, but not limited to, the

following:

  a. Defendants' acts and omissions, as alleged above, constitute a material breach of the provisions of the Contract;

  b. Defendants' acts and omissions, as alleged above, constitute substantial unlawful interference with and impairment of HARRIS' vested rights under the Contract; and

  c. Defendants' acts and omissions, as alleged above, constitute a deprivation of HARRIS' property without due process under the Fifth and Fourteenth Amendments of the United States Constitution.

77. HARRIS desires a judicial determination establishing the respective rights, duties, and obligations of the parties with regard to HARRIS' contentions and the above-described actions of Defendants.

WHEREFORE, HARRIS prays for judgment as hereinafter set forth.

### SECOND CAUSE OF ACTION: INJUNCTIVE RELIEF
### (Against All Defendants)

78. HARRIS incorporates all of the above paragraphs as though each were fully set forth herein.

79. The actions of Defendants as alleged herein constitute violations of California and federal law, and material breaches of the Contract.

80. HARRIS has performed all of its duties and obligations under the Contract except those duties and obligations waived or excused by Defendants' breaches.

81. HARRIS has no adequate remedy at law for the injuries currently being suffered. If Defendants are not required to comply with their legal obligations and the terms of the Contract and are instead permitted to proceed with threatening to terminate or actually terminating HARRIS for default, HARRIS is informed and believes that HARRIS will continue to suffer extreme prejudice and irreparable harm.

82. As a proximate result of the conduct of Defendants, HARRIS has been or will be damaged so long as Defendants are not enjoined from threatening to terminate or actually

terminating HARRIS for default.

83.  HARRIS is entitled to receive a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Defendants, as well as their agents, servants, employees and all persons acting under, in concert with, or for them.

84.  The harm HARRIS will suffer if injunctive relief is not granted will greatly exceed any harm that Defendants might sustain as a result of its issuance.

WHEREFORE, HARRIS prays for judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983
### (Against All Defendants)

85.  HARRIS incorporates all of the above paragraphs as though each were fully set forth herein.

86.  Defendants' acts and omissions, as alleged above, constitute a violation of HARRIS' right to prosecute the Contract without undue, unfair, and inappropriate governmental interference.

87.  Defendants' acts and omissions, as alleged above, constitute a violation of HARRIS' right to pursue its occupation and business without undue, unfair, and inappropriate governmental interference.

88.  Defendants' acts and omissions, as alleged above, constitute substantial unlawful interference and impairment of HARRIS' vested contractual rights, in violation of the Contracts Clause of the United States Constitution, Article 1, § 10, cl. 1, in that:

    a.  Defendants' attempts to proceed with issuing a termination for default against HARRIS without any legal or factual basis for doing so constitutes substantial unlawful interference with and impairment of HARRIS' vested rights under the Contract;

    b.  Defendants' attempts to proceed with issuing a termination for default against HARRIS amounts to a constructive or *de facto* debarment of HARRIS from future work on public works projects and constitutes substantial unlawful interference with and impairment of HARRIS' vested

HARRIS CONSTRUCTION CO., INC.'S COMPLAINT

rights under the Contract;

    c. Defendants' attempts to proceed with issuing a termination for default against HARRIS in an improper attempt to collect on HARRIS' Performance Bond constitutes substantial unlawful interference with and impairment of HARRIS' vested rights under the Contract; and

    d. Defendants' attempts to compel HARRIS to perform change work not encompassed by the Contract without adequate funding to compensate HARRIS for such work constitutes substantial unlawful interference with and impairment of HARRIS' vested rights under the Contract.

89. Defendants' acts and omissions, as alleged above, constitute a deprivation of HARRIS' property without due process under the Fifth and Fourteenth Amendments of the United States Constitution, in that:

    a. Defendants' actions constitute a deprivation of HARRIS' liberty and property interests under the Contract without due process of law;

    b. Defendants' actions constitute a deprivation of HARRIS' liberty interests in its business and reputation without due process of law;

    c. Defendants' actions constitute a *de facto* debarment of HARRIS from serving on further public works projects without due process of law; and

    d. Defendants' actions also constitute a violation of HARRIS' right to pursue its occupation and business without undue, unfair, and inappropriate government interference.

90. Each of the interests described herein is a cognizable and protected interest under the United States Constitution and 42 U.S.C. § 1983.

91. Upon information and belief, Defendants' acts and omissions, as alleged herein, were each taken under color of state law.

92. Upon information and belief, as CEO of Tulare Regional Medical Center, Defendant SHAWN BOLOUKI has final policymaking authority for the Tulare Regional Medical Center, and within this capacity adopted a policy, practice, or custom that resulted in the above-

described violations of HARRIS' constitutionally-protected rights.

93. Upon information and belief, as CEO of Tulare Regional Medical Center, Defendant SHAWN BOLOUKI ratified the actions of Tulare Regional Medical Center's agents and employees that amount to a policy, practice, or custom of engaging in the above-described violations of HARRIS' constitutionally-protected rights.

94. Upon information and belief, Defendants' acts and omissions, as alleged herein, were each taken with the specific intention of causing harm to HARRIS' existing and future contractual and economic relationships.

95. Upon information and belief, Defendants' acts and omissions, as alleged herein, serve no legitimate public purpose.

96. Defendants' acts and omissions, as alleged herein, have damaged and will continue to cause damage to HARRIS' professional reputation in the community.

97. Defendants' acts and omissions, as alleged herein, have damaged or will cause irreparable damage to HARRIS' bonding capacity, resulting in lost future projects and profits thereon, and certain financial obligations to its surety.

98. Defendants' acts and omissions, as alleged herein, have damaged HARRIS' ability to obtain work in the future, resulting in lost future projects and profits thereon.

99. Defendants' acts and omissions, as alleged herein, were the actual, direct, and proximate cause of the deprivation of HARRIS' constitutionally-protected rights described herein.

100. As a direct, proximate, and foreseeable result of Defendants' above-mentioned acts and omissions, HARRIS has suffered and will continue to suffer injury.

101. HARRIS has incurred and will continue to incur attorneys' fees and costs as a result of Defendants' acts and omissions, in amounts that cannot yet be determined. Such fees and costs are recoverable against Defendants in this action under the provisions of 42 U.S.C. §§ 1983 and 1988(b).

WHEREFORE, HARRIS prays for judgment as hereinafter set forth.

///

## PRAYER FOR RELIEF

WHEREFORE, HARRIS respectfully prays entry of judgment against Defendants for relief as follows:

**AS TO THE FIRST CAUSE OF ACTION:**

1. For judicial declarations, decrees, or orders establishing that:

    a. HARRIS is not in default under the Contract nor has it materially breached any provision of the Contract;

    b. HARRIS' rights under the Contract bar Defendants from proceeding with a termination for default against HARRIS in an improper attempt to collect on the Performance Bond; and

    c. HARRIS has rights under the Contract that bar Defendants from directing HARRIS to perform work on the Project without any intent or ability to provide compensation.

2. For injunctive relief, enjoining and restraining Defendants from:

    a. Wrongfully and unlawfully issuing a termination for default against HARRIS in an improper attempt to collect on the Performance Bond; and

    b. Directing HARRIS to perform work on the Project for which Defendants lack adequate funding.

3. For such other and further relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION:**

4. For judicial declarations, decrees, or orders establishing that:

    a. HARRIS is not in default under the Contract nor has it materially breached any provision of the Contract;

    b. HARRIS' rights under the Contract bar Defendants from proceeding with a termination for default against HARRIS in an improper attempt to collect on the Performance Bond; and

    c. HARRIS' rights under the Contract bar Defendants from directing HARRIS to perform work on the Project without any intent or ability to provide compensation.

5. For injunctive relief, enjoining and restraining Defendants from:

   a. Wrongfully and unlawfully issuing a termination for default against HARRIS in an improper attempt to collect on the Performance Bond; and

   b. Directing HARRIS to perform work on the Project for which Defendants lack adequate funding.

 6. For such other and further relief as the Court deems just and proper.

**AS TO THE THIRD CAUSE OF ACTION:**

 7. For judicial declarations, decrees, or orders establishing that:

   a. Defendants' attempts to proceed with a termination for default against HARRIS under the circumstances are in violation of the Contracts Clause of the United States Constitution;

   b. Defendants' attempts to proceed with a termination for default against HARRIS under the circumstances are in violation of HARRIS' due process rights secured by the Fifth and Fourteenth Amendments of the United States Constitution;

   c. Defendants' attempts to compel HARRIS to perform change order work without adequate funding to pay for such work are in violation of the Contracts Clause of the United States Constitution; and

   d. Defendants' attempts to compel HARRIS to perform change order work without adequate funding to pay for such work are in violation of HARRIS' due process rights secured by the Fifth and Fourteenth Amendments of the United States Constitution.

 8. For injunctive relief, enjoining and restraining Defendants from:

   a. Wrongfully and unlawfully issuing a termination for default against HARRIS in an improper attempt to collect on the Performance Bond; and

   b. Directing HARRIS to perform work on the Project for which Defendants lack adequate funding.

 9. For costs of suit, including reasonable attorneys' fees, incurred by HARRIS, pursuant to 42 U.S.C. §§ 1983 and 1988(b), and as otherwise authorized by law.

 10. For such other and further relief as the Court deems just and proper.

///

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW

HARRIS CONSTRUCTION CO., INC.'S COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff HARRIS CONSTRUCTION CO., INC. hereby demands a trial by jury on all issues so triable in the above-entitled action.

Dated: October 15, 2013                     WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.

By: _____
Bennett J. Lee
Andrew Van Ornum
Attorneys for Plaintiff
HARRIS CONSTRUCTION CO., INC.